Filed 11/6/14  P. v. Suruy CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057934 |
| v. | (Super.Ct.No. BAF1100248) |
| RICHARD ANGEL SURUY, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Affirmed with directions.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Charles C. Ragland and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

A jury convicted defendant and appellant Richard Angel Suruy of 38 felony counts arising from his participation in a series of armed robberies that took place in March and April 2011. Counts 1 through 5 arose from an incident at a video store where two store employees were robbed. About five days after the incident, a detective showed the employees a "wanted bulletin" concerning a robbery that took place at a donut shop on the same day they were robbed. That bulletin included photographs of defendant committing the donut shop robbery. The video store employees indicated that the person in the wanted bulletin was the person who had robbed them. Seven weeks later, after defendant was apprehended, the video store employees selected defendant's photograph from a six-pack photographic lineup. During trial, they identified defendant in court as the robber.

Defendant contends the court erred in denying his motion to exclude the video store employees' identification evidence. He argues that the wanted bulletin was impermissibly suggestive and the subsequent identifications were tainted by that initial identification. Although we agree that the use of the wanted bulletin was suggestive and unnecessary, we reject defendant's argument because the witnesses' identifications were reliable under the totality of the circumstances.

In addition to sentencing defendant to 51 years in prison, the court ordered defendant to participate in a substance abuse program or counseling and that he not own or possess firearms, ammunition, or deadly weapons for life. Defendant contends these

orders were unauthorized and must be reversed. We agree and will strike those portions of the judgment. We otherwise affirm the judgment.

## II. STATEMENT OF FACTS

A. *The Video Store Robbery*

On March 3, 2011, at approximately 4:52 p.m., defendant entered a video store in Ontario. Jonathan Armendarez, a store employee, was assisting other customers. Defendant stayed in the store until all other customers left. He brought an empty video box to Armendarez, who then went to the back of the store to retrieve the video. About the same time, Victor Marcial, another store employee, entered the store to begin his shift. Marcial greeted defendant and walked to the back of the store.

Defendant followed Armendarez and Marcial to the back of the store, pulled out a short—12- to 14-inch—shotgun, and brandished the shotgun at Armendarez and Marcial. Because of the small size of the shotgun, Armendarez thought it was a "fake attempt" or one of Marcial's friends playing around. Armendarez realized "this was real" when defendant said, "[g]et back there, motherfucker, and I'm not playing," and then opened the gun, revealed the shotgun shell inside, and recocked the shotgun. Defendant used "extreme language" and demanded each employee's money, car keys, and cell phones. He also demanded money from the cash register. Armendarez gave defendant his car keys, personal funds, and the cash register funds because defendant said he would kill him if he did not comply. Marcial surrendered his cell phone because he was afraid. The entire incident lasted between two and one-half minutes and five minutes.

3

At some point during the incident, Marcial noticed the robber had a tattoo of cursive writing on his neck. Marcial told a police officer about the tattoo.

Defendant has a tattoo on his neck of cursive writing that states: "Bad things come in pairs of two."

B. *The Donut Shop Robbery*

Five hours after the video store robbery, defendant and an accomplice entered a donut shop in Rialto. Defendant's face was not covered. The accomplice had a bandanna covering most of his face that left only his eyes and forehead visible.

Defendant jumped over the donut shop counter, pointed a shotgun at an employee, and demanded his wallet. When another employee approached, defendant pointed a shotgun at his face and demanded his wallet and the money from the cash register. The employee opened the cash register and defendant took the money. Defendant's accomplice, also armed with a shotgun, robbed two customers in the store. The incident was recorded by the donut shop's video surveillance equipment. The video recording was played to the jury at trial.

C. *The Identification of the Donut Shop Robber as the Video Store Robber*

Ontario Police Department Detective Roger Planas was assigned to investigate the video store robbery. He was aware of a description of the robber as a "Hispanic male, tall, using a sawed off shotgun." He did not have any surveillance video of the incident.

Four days after the robbery Detective Planas saw a wanted bulletin regarding the donut shop robbery. The bulletin had the words, "WANTED BULLETIN," in large red

4

letters across the top, and below them the words, "ARMED ROBBERY," also in red. It included a physical description of the suspect as a Hispanic male, 5 feet 10 inches tall, 180 pounds, and between the ages of 20 and 25. The bulletin stated: "On 03-03-11, at about 2152 hours, the suspect pictured below and a second suspect that was wearing a mask entered the doughnut shop located at 342 S. Riverside Ave in the City of Rialto. Both suspects were armed with shotguns and robbed the business and several patrons." Below the description were three color photographs taken from the donut shop surveillance video. The pictures showed the donut shop robber pointing a sawed-off shotgun during the robbery. No tattoos were visible in the photographs and the bulletin did not contain defendant's name.

Detective Planas testified that the bulletin "caught [his] attention" because he does not "see that many sawed off shotguns used as a weapon during a robbery . . . ." Although "it was a shot in the dark," he decided to show the wanted bulletin and larger, blown-up versions of the photographs used in the bulletin to Armendarez and Marcial, the victims of the video store robberies.

On March 8, 2011, five days after the video store and donut shop robberies, Detective Planas showed Armendarez the wanted bulletin and then the three photographs. Nothing in the wanted bulletin was redacted. Detective Planas asked Armendarez if the person in the crime bulletin and photographs was the person who robbed him. Armendarez said he was "90 percent sure" it was. At trial, he testified that he read the crime bulletin, but was paying more attention to the photographs.

5

The next day, Detective Planas met with Marcial. Marcial described the robber to Detective Planas and said the robber had cursive writing tattooed on the right side of his neck. Detective Planas showed the wanted bulletin, then the photographs, to Marcial and asked him if the person in the photographs was the robber. Marcial was "[p]retty sure" it was, and told Detective Planas, "yeah, that was him." At trial, Marcial testified that he did not read the words on the wanted bulletin prior to identifying the man in the photographs and that he made the identification based on "[h]is face."

D. *Defendant's Arrest and Photographic Lineup Identification By Armendarez and Marcial*

On March 19, 2011 (about three weeks after the video store and donut shop robberies), defendant, armed with a shotgun, and an accomplice robbed two individuals in a parking lot in Moreno Valley.

In the early morning of April 22, 2011, defendant participated in robberies at a gas station and two convenience stores. The last of these incidents occurred at a convenience store in Cabazon. A law enforcement agency issued a "bolo," or be on the lookout, broadcast regarding these robberies. A bolo includes information about the type of crime, the time the crime occurred, whether weapons were involved, and descriptions of the suspects or vehicles. In this instance, the bolo referred to a champagne or silver Honda Accord that was involved with robberies at the convenience store and a gas station. Riverside Sheriff's Deputy David Abasta heard the bolo that morning.

6

Deputy Abasta completed his shift that morning and drove to a restaurant in Cabazon for breakfast. When he arrived, he saw a silver or champagne-colored Honda Accord that matched the vehicle described in the bolo. Deputy Abasta parked his car about 100 feet away. He saw defendant and two other men milling around the car, talking to each other. The three men removed hoodie sweatshirts and changed their clothes. Deputy Abasta called dispatch and requested on-duty officer backup.

The officers arrived and detained defendant and the two other men. Searches of the men and the car revealed incriminating evidence, including a shotgun loaded with four shotgun shells, a plastic bag from the convenience store, a hood or face mask, gloves, a knit cap, and a cell phone belonging to a victim of the convenience store robbery.

After defendant was arrested, police determined that defendant was the person pictured in the donut shop wanted bulletin. Detective Planas, the officer investigating the video store robbery, then prepared a six-pack photographic lineup that included a picture of defendant. He used a booking photograph of defendant taken in August 2010.

On April 25, 2011, Armendarez and Marcial went to the police station where Detective Planas showed them each, separately, the photographic lineup. They each circled the photograph of defendant and identified him as the video store robber. When asked how sure he was of his selection, Armendarez testified that he was "[p]retty darn certain."

7

E. *Suruy's Motion to Exclude Identification Testimony*

At the outset of the trial, defendant filed a motion to exclude Armendarez's and Marcial's identification testimony. The motion was based on the use of the donut shop wanted bulletin and the related donut shop surveillance photographs. In discussing the motion, the prosecutor represented to the court that when Marcial was shown the wanted bulletin and the three large photographs taken from the donut shop surveillance video, Marcial "specifically stated, 'Yes, that is him, and he has a cursive tattoo writing on his neck,' which is not viewable in the three photographs or on this bulletin."

The trial court agreed with Suruy's argument that the wanted bulletin was "inherent[ly] suggestive," but stated that the suggestiveness was "not enough to render the identification inadmissible." In denying the motion, the court noted that the witnesses had an excellent opportunity to view the robber and were acutely aware of what was happening during the robberies. It further observed that the witnesses' memory would have been reasonably fresh at the time they saw the photographs. Finally, the court stated that Marcial's description of defendant's tattoo, "tip[ped] the balance" in favor of admissibility.

After ruling on the motion, Detective Planas, Armendarez, and Marcial testified at trial about the initial identification of the video store robber as the person pictured in the donut shop wanted bulletin and the subsequent identification of defendant in the six-pack lineup. They also identified defendant in court as the video store robber. Armendarez

8

testified he was 100 percent certain defendant was the robber. (Marcial was not asked to express the confidence of his identification in a percentage.)

## III. DISCUSSION

A. *Admissibility of Identification Evidence*

Defendant argues the convictions on the counts arising from the video store robbery must be reversed because the pretrial identification procedures used by Detective Planas were impermissibly suggestive and the subsequent identifications were unreliable. Although we agree that the wanted bulletin was suggestive, the court did not err in allowing evidence of the identifications because, under the totality of the circumstances, there was no substantial likelihood of misidentification.

### 1. Legal Principles and Standard of Review

An accused's right to due process is implicated when the police "use an identification procedure that is both suggestive and unnecessary." (*Perry v. New Hampshire* (2012) ___ U.S. ___ [132 S.Ct. 716, 724].) "Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." (*Ibid.*) The court must further "assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.' [Citations.] '[R]eliability [of the eyewitness identification] is the linchpin' of that evaluation . . . . [Citations.] Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed. [Citation.] Otherwise, the evidence

9

(if admissible in all other respects) should be submitted to the jury."  (*Id.* at pp. 724-725, fn. omitted.)

In evaluating the reliability of the identification, the "factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  (*Manson v. Brathwaite* (1977) 432 U.S. 98, 114; accord, *People v. Cunningham* (2001) 25 Cal.4th 926, 990.)

Defendant bears the burden to prove that the identification procedure was unduly suggestive and unreliable.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 413; *People v. Gonzalez* (2006) 38 Cal.4th 932, 942.)

The admissibility of pretrial identification testimony is a mixed question of law and fact.  (*People v. Kennedy* (2005) 36 Cal.4th 595, 608.)  "We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive."  (*People v. Gonzalez, supra,* 38 Cal.4th at p. 943.)

2.  <u>The Use of the Wanted Bulletin Was Suggestive and Unnecessary</u>

We agree with defendant and the trial court that the wanted bulletin shown to Armendarez and Marcial was suggestive of the fact that the person pictured in the wanted bulletin was the video store robber.  Initially, we note that courts have repeatedly

10

condemned the use of a single photograph in an identification procedure. (See, e.g., *People v. Contreras* (1993) 17 Cal.App.4th 813, 820, citing, e.g., *Stovall v. Denno* (1967) 388 U.S. 293, 302 & *Foster v. California* (1969) 394 U.S. 440, 443.) Indeed, the Supreme Court has indicated that the use of a single photograph "fall[s] short of the ideal" (*Simmons v. United States* (1968) 390 U.S. 377, 386, fn. omitted), and "may be viewed in general with suspicion" (*Manson v. Brathwaite, supra,* 432 U.S. at p. 116).

Our state Supreme Court has stated that "[t]he danger of error in identification is at its greatest when the police display only the picture of a single individual and it is heightened when the witness has indications that there is other evidence that the person in the photograph committed the crime." (*People v. Nation* (1980) 26 Cal.3d 169, 180.) Here, Armendarez and Marcial were shown not merely *photographs* of the donut shop robber, but a wanted bulletin describing the photographed suspect as armed with a shotgun during the robbery of a small retail store and its patrons in a nearby city just five hours after the video store robbery. The two robberies took place not only close in time and location to each other, but are factually similar: a Hispanic man armed with a shotgun commits a robbery in a small retail store. The presentation of the wanted bulletin to Armendarez and Marcial by a detective investigating the video store robbery is strongly suggestive of the fact that the person pictured in the wanted bulletin is the person who robbed them. (See *People v. Contreras, supra,* 17 Cal.App.4th at p. 820 [showing witness a photograph of the defendant "could only suggest to [the witness] that the police believed [the defendant] to be the other assailant."].)

11

In arguing that the wanted bulletin was not unduly suggestive, the Attorney General relies on *People v. Johnson* (2010) 183 Cal.App.4th 253. In *Johnson*, three days after an attempted armed robbery, an officer showed the victim of the attempted robbery a "media release" and still photographs posted on a sheriff's department Web site pertaining to a murder that took place the day before. (*Id.* at p. 265.) The witness identified the person in the photographs as the person who attempted to rob her three days prior. (*Ibid*.) The witness subsequently identified the defendant in an in-person lineup and in court. (*Ibid.*) The defendant asserted the court erred in failing to suppress the witness's pretrial and trial identifications because the "police suggestively tainted the lineup identifications by . . . showing the witnesses photos before the live lineups." (*Id.* at p. 270.) The Court of Appeal rejected the argument because the defendant had "not submitted copies of the photos [the witness] viewed on the sheriff's Web site." (*Id.* at p. 272.) The court could not, therefore, "determine what prejudicial effect, if any, those photos could have had on [the witness's] subsequent identification of [the defendant] in the live lineup. Although the photos were made from the surveillance video, [the court did] not know what exactly they depicted." (*Id.* at pp. 272-273.) Accordingly, the defendant "fail[ed] to demonstrate [the witness's] identification of him occurred under unduly suggestive procedures." (*Id.* at p. 273.)

In contrast to *Johnson*, defendant in the present case did submit copies of the wanted bulletin and the three enlarged photographs; we do know what was depicted.

Thus, unlike the *Johnson* court, we can evaluate the suggestiveness of the procedure. *Johnson*, therefore, is not controlling here.

Showing the wanted bulletin to the witnesses was also unnecessary. If Detective Planas wanted to determine whether the suspect in the donut shop robbery was the same person who committed the video store robbery, he could have shown Armendarez and Marcial still photographs taken from the donut shop surveillance video without showing them the wanted bulletin. Indeed, Detective Planas had the still photographs that were used to create the bulletin with him when he met with Armendarez and Marcial. There thus appears to be no legitimate reason to show them the unredacted wanted bulletin.

3. Reliability of the Identification

Although showing the wanted bulletin to Armendarez and Marcial was suggestive and unnecessary, the witnesses' identifications are still admissible if they are reliable under the totality of the circumstances. (*People v Cook* (2007) 40 Cal.4th 1334, 1354.) As noted above, courts are to consider the totality of the circumstances, including factors such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. (*Ibid.*)

Armendarez and Marcial had ample opportunity to view the robber before and during the robbery and had a high degree of attention on him. When defendant entered the store, he appeared to be a customer; he was not wearing a mask or hood, which

13

allowed the employees unobstructed views of his face. By the time he approached Armendarez, there were no other customers in the store. The defendant stood close enough to Armendarez to hand him a DVD box. Undistracted by others, Armendarez's attention was focused on defendant.

As Marcial entered the store, he believed defendant was a customer and greeted him. At this point, both Armendarez and Marcial had clear, undistracted opportunities to view defendant at close range, in a well lit area, prior to the commencement of the robbery. Because both witnesses interacted with defendant before they knew they were about to be robbed, we are unpersuaded by defendant's suggestion that their memories were impaired by "the traumatic nature of this encounter."

The ability to view the robber continued as the ostensible business transaction turned to criminal activity. After defendant followed Armendarez and Marcial to the back of the store, he pointed a shotgun at them. He yelled at them, racked the shotgun, and demanded the cash register money and each employee's money, cell phone, and car keys. Armendarez and Marcial were thus direct objects of the defendant's demands, and handed or threw him the items he wanted. Only after both employees complied with defendant's demands did defendant tell them to look away from his face. The witnesses' opportunity to view the defendant, their high degree of attention on him, and Marcial's description of defendant's tattoo weigh heavily in support of the reliability of their identifications.

14

Marcial's ability to view the robber and his attention on him is also demonstrated by the fact that he noticed and gave a description of the cursive writing tattooed on defendant's neck before it could be seen in any photograph.

Armendarez and Marcial also provided a fairly high level of confidence in their identifications. Armendarez said that based "solely" on the photographs, he was "90 percent sure" that the person in the photographs was the person who robbed him. When Marcial was shown the photographs and crime bulletin, he told Detective Planas, "yeah, that was him." At trial, he said he was "[p]retty sure" of his identification at that time. He also said that he did not read the words on the wanted bulletin prior to his identification and that the identification was based solely on "[h]is face." The reliability of the identifications is strengthened by the fact that each of the witnesses separately picked defendant out of a six-pack photographic lineup and at trial. Indeed, Armendarez was "[o]ne hundred percent" certain defendant was the man who robbed him.

Finally, the time between the robbery and the identification of the person in the crime bulletin photographs as the video store robber was relatively short. Armendarez's identification took place five days after the robbery occurred; Marcial's identification was made on the sixth day after the robbery. It is likely that the image of the robber was still fresh in their minds at that time.

In light of the factors discussed above and the totality of the circumstances, we conclude that the identifications were reliable and there was no likelihood that the use of the crime bulletin, while suggestive, created a substantial likelihood of misidentification.

15

Therefore, the trial court did not err in allowing Armendarez's and Marcial's identification testimony.

B. *Drug Counseling Order and Firearms Prohibition*

At the sentencing hearing, the court "ordered [defendant] to participate in a counseling or educational program having a component of substance abuse." The court further ordered defendant "not to knowingly own, possess or have under [his] control any firearm, deadly weapon, ammunition or related paraphernalia for life," citing former Penal Code section 12021.[1] Defendant contends these orders must be reversed and vacated because they were unauthorized. We agree.

1. Substance Abuse Counseling or Education Program

The court cited section 1203.096 as authority for ordering defendant to participate in substance abuse counseling or a substance abuse program while in prison. Section 1203.096, subdivision (a) provides: "Upon conviction of any felony in which the defendant is sentenced to state prison and in which the court makes the findings set forth in subdivision (b), a court shall, in addition to any other terms of imprisonment, fine, and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.
At the time of defendant's December 2012 sentencing hearing, section 12021 had been repealed. (Stats. 2010, ch. 711, § 4, p. 4036.) The part pertinent here was reenacted without substantive change as section 29800, subdivision (a)(1), which provides: "Any person who has been convicted of a felony under the laws of . . . the State of California . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."
The court also cited to section 922(g)(1) of title 18 of the United States Code, which makes it unlawful for a convicted felon to "possess . . . any firearm or ammunition."

16

conditions, *recommend* in writing that the defendant participate in a counseling or education program having a substance abuse component while imprisoned." (Italics added.)

Section 1203.096 provides that the trial court can *recommend* that a convict participate in a substance abuse counseling or education program while imprisoned; however, it does not authorize the court to *order* defendant to participate in such counseling or program. The Attorney General concedes the error and does not refer us to any statute that could authorize such an order. Accordingly, the sentencing order is in that respect improper and shall be stricken.

2. Firearm Prohibition

Defendant contends the order prohibiting him from possessing firearms, dangerous or deadly weapons or related paraphernalia is unauthorized. We agree.

"[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) "The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment." (*People v. Rodriguez* (1998) 66 Cal.App.4th 157, 173, fn. 14.) Furthermore, "[a] court cannot impose a greater penalty than that fixed by the statute violated." (*In re Howard* (1945) 69 Cal.App.2d 164, 165.)

17

Trial courts do have sentencing discretion in certain matters as provided by the Legislature. (*People v. Scott, supra,* 9 Cal.4th at p. 349.) Such discretion includes "the decision to order probation rather than imprisonment, to impose lower or upper term instead of the middle term of imprisonment, to impose consecutive rather than concurrent sentences under certain discretionary provisions, and to strike or stay certain enhancements or waive a restitution fine." (*Ibid.*) Courts do not, however, have discretion to impose a sentence or make an order not authorized by law.

Here, none of the sentencing statutes for defendant's crimes authorizes the court to order defendant not to possess firearms or deadly weapons. Although courts, in addition to sentencing a convicted defendant to time in prison, are authorized to impose fines and make other orders, we have not been referred to any statute or rule that permits the court to make the challenged order.

The Attorney General points out that it is a crime for a convicted felon to own or possess firearms. (See, e.g., §§ 29800, subd. (a)(1), 29900, subd. (a)(1); see also § 30305, subd. (a)(1) [persons prohibited from owning or possessing firearms are prohibited from owning or possessing ammunition].) Therefore, the Attorney General argues, the order "simply reiterates prohibitions already contained in the Penal Code." There are several problems with this argument.

First, the order not only prohibits ownership and possession of firearms and ammunition, but also "deadly weapon[s]" and "related paraphernalia." A deadly weapon may include such things as a bottle, pencil, or screwdriver. (*People v. Brown* (2012) 210

18

Cal.App.4th 1, 7; *People v. Page* (2004) 123 Cal.App.4th 1466, 1472 [Fourth Dist., Div. Two]; *People v. Simons* (1996) 42 Cal.App.4th 1100, 1107.)  As the cited cases indicate, using such items in a manner capable of producing and likely to produce great bodily injury may be a crime; however, merely owning or possessing them is not.  The problem is exacerbated by the phrase "related paraphernalia."  By its terms, the order thus appears to prohibit defendant from possessing paraphernalia related to such items as bottles, pencils, and screwdrivers.  Even if the "related paraphernalia" phrase is construed as relating only to firearms, we have not been referred to any law that prohibits the ownership or possession of firearm "paraphernalia."  The order, therefore, is broader than the prohibitions in the Penal Code and potentially exposes defendant to punishment for contempt of the court's order when he has not otherwise violated any law.

Second, the court's order is "for life."  Felony possession of a firearm or ammunition is a crime only for so long as the pertinent statutes are operative.  The defendant, quite simply, may outlive the statutes.  If he does, the court's order will prohibit his ownership or possession of firearms and ammunition even when the Legislature has not.  If he then owns or possesses a firearm, he will still be guilty of criminal contempt even if he has not otherwise committed a crime.  (See § 166, subd. (a)(4).)**2**

---

**2**  Even if defendant does not outlive the laws prohibiting felons from possessing firearms, by prohibiting the same criminal conduct by court order, the same conduct will constitute two crimes—felony possession of a firearm and contempt.

19

Third, if defendant is subsequently in possession of a firearm he may have a defense to violating section 29800 but still be in contempt of the court's order. For example, a felon can possess a firearm to defend himself or others without violating section 29800. (See *People v. King* (1978) 22 Cal.3d 12, 24; *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1034-1035.) The court's order, by contrast, appears to not permit any defense or exception.

Because the court's order that defendant be prohibited from owning or possessing firearms and ammunition and related paraphernalia for life is unauthorized and not harmless, it shall be stricken.

## IV. DISPOSITION

The order that defendant participate in a counseling or educational program and the order that defendant not own, possess, or have under his control any firearm, deadly weapon, ammunition, or related paraphernalia for life are stricken. Upon remand, the court shall issue a minute order reflecting the striking of these orders. The court shall also direct that an amended abstract of judgment issue omitting the order that defendant participate in a counseling or educational program. The court shall forward a copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING

J.

20

We concur:

RICHLI
                 Acting P. J.

MILLER
                      J.